[No. 3751.   Decided February 27, 1901.]

JENNIE CAMERON SHANNON et al., Respondents, v. CONSOLIDATED TIGER AND POORMAN MINING COMPANY, Appellant.

APPEAL — NOTICE — DESCRIPTION OF JUDGMENT.

A notice of appeal which recites "that the defendant in the above entitled action hereby appeals from the judgment made and entered herein against the defendant on the 24th day of July, 1900, to the supreme court of the state of Washington, and from the whole and every part thereof," is sufficient, although the judgment was signed by the judge July 16th, but not filed and entered by the clerk till July 24th, when there was but one judgment in the case, and the respondent could not have been misled.

SAME — BOND — TIME OF FILING.

Under Bal. Code, § 6505, which provides that the appeal bond may be filed with the clerk "at or before the time when the notice of appeal is given or served," a bond filed on August 25th was in

due time, when notice of appeal was given on August 24th and filed on the next day.

SAME — REFERENCE TO JUDGMENT APPEALED FROM.

An appeal bond sufficiently describes the judgment when it refers to it as having been made on July 16th, when it was in fact signed by the judge on that date, but not entered by the clerk until July 24th—there being but one judgment in the case.

SAME — SUFFICIENCY OF BOND — DESCRIPTION OF OBLIGEE.

An undertaking given on appeal, intended both as an appeal bond and a supersedeas bond, which undertakes "that the appellant will satisfy and perform the judgment appealed from," is sufficient, without mentioning the name of the obligee with particularity.

CONTINUANCE — SUFFICIENCY OF SHOWING MADE.

A motion for a continuance was properly denied, when the affidavit in support thereof failed to set out the evidence on account of the absence of which the motion was made, and there was no showing that the absent witness would be present at a later trial or that he could be found, or his evidence produced at the trial.

GUARDIAN AD LITEM — APPOINTMENT OF NON-RESIDENT.

Where a non-resident parent and minor children submit themselves to the jurisdiction of this state by instituting a joint action in one of its courts, it is not error for the court to appoint the parent as guardian *ad litem* for such minors, since Bal. Code, § 4832, provides that when an infant is a party, if he has no guardian, the court shall appoint one to act, and there is no provision requiring a guardian *ad litem* to be a resident of the state.

MASTER AND SERVANT — NEGLIGENCE — WHETHER MASTER'S OR FELLOW SERVANT'S — INSTRUCTIONS.

In an action for damages caused by the accidental discharge of a missed blast, in which it became a question for the jury as to whether the "boss" or "pusher" of a shift of workmen was a vice principal or a co-laborer with plaintiff's intestate, an instruction is not erroneous when it charges the jury that "persons working together in a common general employment may be fellow servants with regard to that general employment, and yet it might be under the circumstances that one of them could be a principal or master with regard to some particular part of that employment." As an illustration, "it might be that a shift working in a shaft would be fellow servants with regard to driving

holes, blasting, mucking out, and yet it might be that the principal or master could have delegated to one of them the duty of seeing that all the blasts were discharged, and that there were no missed holes left when the succeeding shift should come on to work. So that as to that particular duty, if the principal should have assumed that duty, . . . then the principal could have delegated that particular duty to one of those who were engaged as a fellow servant in the other duties mentioned," since such instruction, taken together with others given on the same subject, should be construed as meaning that, if the jury found from the evidence that the pusher on each shift had been appointed by the defendant to look for hidden or unusual dangers not inherent in the work, and not to be anticipated in the labor in which deceased was employed, and to report the same to those working with and under him, then he was a vice principal, and his negligence would be imputed to the defendant.

SAME — DUTY TO PROVIDE SAFE PLACE TO WORK.

Where the men engaged in sinking a shaft in a mine were divided into three eight-hour shifts, and one man on each shift was known as a "pusher," doing the same work as his fellows, but having general direction of the work of his shift, and charged by the master with the duty of notifying the on-coming shift of any "missed holes" of undischarged dynamite, the failure of the pusher of an out-going shift to notify the on-coming shift of the existence of a missed hole, was the negligence of the master and not that of a fellow servant.

Appeal from Superior Court, Spokane County.—Hon. LEANDER H. PRATHER, Judge. Affirmed.

*John R. McBride, M. A. Folsom* and *Heyburn, Heyburn & Doherty,* for appellant:

If the servant has notice of the general danger—a danger which is constantly recurring—the master is not charged with the duty of notifying the servant of each particular defect. *Chesapeake & O. Ry. Co. v. Hennessey,* 96 Fed. 713; *Hermann v. Port Blakely Mill Co.,* 71 Fed. 853. Where the furnishing and preparation of the place is itself part of the work which the servant is employed to do, the master is not charged with any duty; and if,

while so furnishing and preparing such place, the servant is injured, he cannot recover. Where conditions are constantly changing there is no liability. As is often said, "The servant in a mine assumes the risks incident to the work in front of him." The above principles are supported by the following cases, many of which were cases of accidents from missed shots: *Browne v. King,* 100 Fed. 561; *Anderson v. Daly Mining Co.,* 50 Pac. 815; *Kenney v. Shaw,* 133 Mass. 501; *Mast v. Kern,* 54 Pac. 950; *Callan v. Bull,* 45 Pac. 1017; *Consolidated Coal Co. v. Clay's Admr.,* 51 Ohio St. 542 (38 N. E. 610); *Lindvall v. Woods,* 41 Minn. 212 (42 N. W. 1020, 4 L. R. A. 793); *Kelley v. Fourth of July Mining Co.,* 41 Pac. 275; *Deep Mining, etc., Co. v. Fitzgerald,* 43 Pac. 210; *Hogan v. Henderson,* 26 N. E. 742; *Martin v. Atchison, T. & S. F. R. R. Co.,* 166 U. S. 399 (41 L. ed. 1051); *Quinn v. New York, N. H. & H. R. R. Co.,* 55 N. E. 891; *Bunt v. Sierra Butte Gold Mining Co.,* 138 U. S. 483 (34 L. ed. 1031); *Gulf, C. & S. F. Ry. Co. v. Jackson,* 65 Fed. 48; *Finalyson v. Utica Mining & M. Co.,* 67 Fed. 509; *Ingebregsten Case,* 31 Atl. 619; *Week v. Fremont Mill Co.,* 3 Wash. 629; *Sayward v. Carlson,* 1 Wash. 29; *Hoffman v. American Foundry Co.,* 18 Wash. 287.

*Robertson & Miller,* for respondents:

The servant assumes none other than usual risks, unless the unusual risks are open, visible, known to and comprehended by him. *Nadau v. White River Lumber Co.,* 76 Wis. 120 (20 Am. St. Rep. 29); *Fort Hill Stone Co. v. Orm's Admr.,* 84 Ky. 183; *Pidcock v. Union Pacific Ry. Co.,* 1 L. R. A. 131; *Northern Pacific R. R. Co. v. Herbert,* 116 U. S. 642 (29 L. ed. 755). Employee may continue work, where the danger is not flagrant.

*Dwyer v. St. Louis & S. F. R. R. Co.*, 52 Fed. 89; *New Jersey & N. Y. R. R. Co. v. Young*, 49 Fed. 723.

It is the duty of the master to inspect the appliances, and the servant upon whom the master devolves its performance represents the master in that respect, and is not, in the discharge of that duty, a fellow servant of the employee injured. *Bennett v. Northern Pacific R. R. Co.*, 13 L. R. A. 467; *Fay v. Minneapolis & St. L. Ry. Co.*, 30 Minn. 231; *International, etc., Ry. Co. v. Kernan*, 78 Tex. 294 (9 L. R. A. 703); *Condon v. Missouri Pacific Ry. Co.*, 78 Mo. 567; *Bushby v. New York, L. E. & W. R. R. Co.*, 107 N. Y. 374 (1 Am. St. Rep. 844); *Ell v. Northern Pacific R. R. Co.*, 48 N. W. 222 (12 L. R. A. 97, 26 Am. St. Rep. 621); *Braun v. Chicago, R. I. & P. R. R. Co.*, 36 Am. Rep. 243; *Louisville, etc., R. R. Co. v. Utz*, 133 Ind. 265; *Hopkins v. O'Leary*, 57 N. E. 342; *Burke v. Anderson*, 69 Fed. 814; *Kelly v. Cable Co.*, 7 Mont. 70; *Anderson v. Bennett*, 19 Pac. 765 (8 Am. St. Rep. 311). It is the duty of the master to search for latent defects. *Little Rock, etc., Ry. Co. v. Leverett*, 48 Ark. 333; *Devlin v. Wabash, etc., Ry. Co.*, 87 Mo. 545.

The opinion of the court was delivered by

MOUNT, J.—This is an action for damages arising out of personal injuries which were received by and resulted in the death of Joseph Shannon, husband of the plaintiff Jennie C. Shannon, and father of the minor plaintiffs above named. The injury occurred in a mine of defendant at Burke, Idaho, on February 14, 1898, by an explosion of dynamite. The deceased, Shannon, was engaged as a miner, on what is termed a "shift," with three others, in sinking a perpendicular shaft in defendant's mine. This shaft was six feet wide north and

south, by fifteen feet long east and west, and about forty feet below the level, fifteen hundred feet below the surface. Engaged in this work were three eight-hour shifts, consisting of four men each. One of the men comprising each shift was what was called a "boss" or "pusher," who had general direction of the work of his shift, directing the men where and how to work, and furnishing materials, tools, and supplies, and who did the same work as his fellows. The shift of which deceased was a member consisted of Murphy, Shannon, Robinson, and Cassidy; Murphy being the boss or pusher. The next shift consisted of Berg and three others; Berg being the boss or pusher. The other shift consisted of Bray and three others; Bray being the boss or pusher. Each shift was known and designated by the name of the boss. The Murphy shift began work each day at 7 a. m. and quit at 3 p. m. The Berg shift began at 3 p. m. and quit at 11 p. m. The Bray shift began at 11 p. m. and quit at 7 a. m. On the 13th day of February, 1898, the Murphy shift, in the discharge of their duties, had drilled with machine drills seventeen holes in the bottom of the shaft to the depth of about six feet, leaving one hole undrilled. The drilling of this hole would have completed that portion of the work. The succeeding shift, known as the "Berg shift," completed the drilling of this hole, and loaded and discharged all the blasts except one in the east end, which failed to explode, leaving what is termed a "missed hole." By rule established by custom in the mine, it was the duty of the boss of the off-going shift to notify the on-coming shift of any missed holes or other dangers. When the Bray shift came on duty, the men were notified of the missed hole above mentioned. This shift cleared out the debris caused by the blasting done

by the previous shift. The Murphy shift came on duty again sixteen hours after they had left the bottom of the shaft as above described. The evidence in the case is contradictory as to whether or not the Murphy shift was notified of this missed hole, which had remained through the work of the two preceding shifts. The Murphy shift came on duty at 7 a. m. on the 14th of February, and found loose rock and debris yet remaining in the shaft, in which water had also accumulated. A pump used in removing this water was out of repair, and much time was taken in clearing the water from the bottom of the shaft. After the water was cleared out, Murphy and Shannon were working in the east end of the shaft and their co-laborers, Robinson and Cassidy, on the west end thereof. A short time before the expiration of the eight-hour time of their shift, and while Murphy and Shannon were clearing up the said debris, Murphy working with pick and Shannon with the shovel, Murphy in some manner discharged said missed blast, which killed both and wounded Robinson, working on the other end, some ten or twelve feet away. Upon the trial of the case before a jury a verdict was returned in favor of the plaintiffs for the sum of $20,000. Judgment was subsequently entered thereon, and appeal taken to this court.

Motion is made to dismiss this appeal for the reasons that the notice of appeal is insufficient, and that the undertaking on appeal was filed prior to the notice of appeal, and does not describe the judgment appealed from, and does not name an obligee. The notice of appeal, omitting the formal parts, is as follows:

"You will please taken notice that the defendant in the above entitled action hereby appeals from the judgment made and entered herein against the defendant on the

24th day of July, 1900, to the supreme of the state of Washington, and from the whole and every part thereof.".

Said notice was served on the attorneys for the respondents on the 24th day of August, 1900, and was filed with the clerk of the lower court on the next day. Under our liberal statutes relating to notices of appeal this notice is sufficient. *Roberts v. Shelton Southwestern R. R. Co.,* 21 Wash. 427 (58 Pac. 576); Laws 1899, p. 79, § 1.

The judgment in this case was signed by the judge of the lower court on the 16th day of July, 1900, and was filed and entered by the clerk on the 24th day of July, 1900. There was but one judgment in the case. The undertaking on appeal was filed on August 25, 1900, and describes the judgment as having been made on July 16th. Under § 6505, Bal. Code, the appeal bond may be filed with the clerk "at or before the time when the notice of appeal is given or served." The notice of appeal was given on the 24th day of August, 1900, and filed the next day. The undertaking is an appeal bond and supersedeas, and undertakes "that the appellant will satisfy and perform the judgment appealed from." Both the notice of appeal and bond were sufficient. The motion will be denied.

Some days before the cause was called for trial defendant filed and argued a motion for a continuance, which motion was denied by the trial court, and this ruling is claimed by appellant as error. Defendant did' not save an exception to the ruling of the court denying this motion for a continuance. We are of the opinion that the motion was properly denied, for the reason that the evidence sought to be obtained, and on account of the absence of which the motion was made, was not set out in the affidavit, no showing was made that the witness'

named would be present at the trial, and no showing that
the witness could be found, or that his evidence would
be produced at the trial.

The next error complained of is that the court erred
in permitting the case to go to the jury because the ap-
pointment of Jennie C. Shannon guardian *ad litem* was
void, for the reason that both she and the minors were
at said time residents of the state of Idaho.    The rec-
ord discloses that at the time of the commencement of
the case the court, upon motion and affidavit showing
the existence of the cause of action and the infancy of
the plaintiffs, Earl B. and Myrtle M. Shannon, the non-
residence of the plaintiff and the said minors, and that
said minors had no regularly appointed guardian, made
an order appointing the said Jennie C. Shannon, the
mother of the infants, their guardian *ad litem* for the
purpose of bringing the action.    This application was
made *ex parte* and without notice to the defendant.    De-
fendant thereafter appeared and filed a motion for se-
curity for costs on account of the non-residence of the
plaintiffs.    The motion was granted and a cost bond filed.
Defendant thereafter appeared and denied the appoint-
ment, on information and belief, and objected to the said
appointment on the ground that the court was without
jurisdiction to make it.    Counsel do not call to our atten-
tion any case directly in point upon the question here,
but cite the case of *De La Montanya v. De La Montanya,*
112 Cal. 131 (44 Pac. 354), in support thereof.    While
this case is not directly in point, it seems to support the
opposite view from that which it was cited to support.
That was a divorce case, where the father had taken his
children out of the jurisdiction of the California courts.
The mother had obtained a decree of divorce, and then
brought an independent action for the custody of the

children, and had a third party appointed guardian *ad litem*. This guardian *ad litem* appeared in the action and admitted the allegations of the complaint. The defendant did not appear in the case. Subsequently the court entered judgment as prayed, and, among other things, awarded the custody of the children to the plaintiff, and required defendant to bring the children into the state of California and surrender them to the plaintiff. Defendant afterwards applied for an order vacating this decree because the court had no jurisdiction to make it. This application being denied, an appeal was taken and the cause reversed. The appellate court said:

"Jurisdiction to appoint a guardian for infants, under the American system, is entirely local. I do not doubt that the mere presence of infants within a jurisdiction is sufficient to confer jurisdiction, although they may be residents of another state. But as such jurisdiction is always exercised for the good of the child, the courts would never allow the power to be used for purposes of oppression, or to prevent an infant temporarily within its jurisdiction from being taken away, when its best interests required it, to its more permanent residence. The jurisdiction is never used except when necessary for the good of the child."

The other authorities cited in support of the contention are upon the question of guardians in probate matters. Clearly, in matters of this kind, the guardian must be appointed upon petition therefor showing property in the state, and a bond must be given. Bal. Code, § 6395 *et seq.* Section 6410, Bal. Code, under the title "Guardianship of Infants," expressly provides as follows:

"Nothing contained in this chapter shall affect or impair the power of any court to appoint a guardian to defend the interests of any minor interested in any suit or

matter pending therein, or to commence and prosecute any suit in his behalf."

Under the title "Parties to Actions," § 4832, Bal. Code, provides:

"When an infant is a party, he shall appear by guardian, or if he has no guardian, or in the opinion of the court the guardian is an improper person, the court shall appoint one to act.    Said guardian shall be appointed as follows:    1.    When the infant is plaintiff, upon the application of the infant, if he be of the age of fourteen years, or if under that age, upon the application of a relative or friend of the infant."

No bond is required in cases of this kind, and there is no provision in our statute requiring a guardian in cases of this kind to be a resident of the state.    We cannot hold that an infant, being, with its parent, a resident of another state, having a joint cause of action existing in its behalf in this state, to which its parent is a party, cannot, by reason of the fact of its non-residence, petition the court to appoint such parent a guardian *ad litem* to maintain that action, especially when such parent is a party plaintiff and has, by bringing the action, subjected herself to the jurisdiction of the court, and is, in fact, with her wards, within the jurisdiction thereof at the trial when objection is first made, and where the infant itself is plaintiff.

The next error complained of is that the court erred in giving to the jury the following instruction:

"Now, gentlemen, I charge you that a fellow servant or fellow servants are those who are working together in a common employment to a common end, under the master or principal.    Persons working together in a common general employment may be fellow servants with regard to that general employment, and yet it might be under the circumstances that one of them could be a principal or master with regard to some particular part

9-24 WASH.

of that employment. As in this case, it might be—Well, I will not take this case. I will take an illustration. It might be that a shift working in a shaft would be fellow servants with regard to driving holes, blasting, mucking out; and yet it might be that the principal or master could have delegated to one of them the duty of seeing that all the blasts were discharged, and that there were no missed holes left when the succeeding shift should come on to work. So that as to that particular duty, if the principal should have assumed that duty,—should have assumed the obligation of performing that duty for them,—then the principal could, I say, have delegated that particular duty to one of those who were engaged as a fellow servant in the other duties that I have mentioned."

The evidence in this case clearly shows that at the time the missed blast was exploded, Murphy, the pusher, and Shannon were working together,—the former using the pick and the latter a shovel,—and that the explosion occurred by reason of a stroke from the pick which Murphy was using. It does not appear that either knew of the existence of the missed blast. Clearly, therefore, if there was no delegated authority from the master to Murphy to notify his co-laborers of any hidden or unseen danger,—dangers which the servants knew, or in the exercise of reasonable diligence should have known, having better facilities for knowing than the master,—Murphy and Shannon were fellow servants, and the neglect of the one to notify the other of such dangers would preclude a recovery by the other against the common master. In the trial of the case it became a question of fact whether the pushers were vice principals or fellow servants with their co-laborers. If they were vice principals, knew of the hidden or unusual danger, when their subordinates were ignorant thereof, and neglected to inform those under them of it, their neglect was the negligence of the

master.  The court simply told the jury, by this instruction, that persons working together as fellow servants might be fellow servants with regard to some parts of the employment, and yet one of them might be a principal or master with regard to some particular part of the employment.  If the court had directed the jury that, if they found from the evidence that the pusher on each shift had been appointed by the defendant to look for hidden or unusual dangers not inherent in the work, and not to be anticipated in the labor in which Shannon and others were employed and to report the same to those working with him and under him, then he was a vice principal, and such pusher's negligence would be imputed to the defendant, defendant could not have questioned the correctness of this instruction; and this, in fact, is the meaning of the instruction above quoted.  The instruction, standing alone, may be subject to criticism, but, taken together with the other instructions upon the same subject, it fairly states the law.  Further along the court uses this language:

"Or if you find from the evidence that there was a missed blast there, and that it was the duty of the defendant to discover it and make it known to the deceased, and that it had been discovered, and that it was placed in such a condition as to be obvious to the deceased when he entered the shaft to work, and that the deceased did see it, or, by the use of reasonable diligence, could have seen it, then you must find for the defendant."

In the trial of the case it became an important question whether the pushers were vice principals or fellow servants, and this was a question upon which the court was instructing the jury, and to which the instruction applied.

Appellant urges as the fourth error excessive damages, given under the influence of passion and prejudice. There

is nothing in the record tending to show any such motive as passion or prejudice on the part of the jury, and, under the rule announced in *Walker v. McNeill,* 17 Wash. 582 (50 Pac. 518), this court will not disturb the verdict herein.

Under the fifth and sixth assignments of error, appellant urges the reversal of this case because the verdict is not supported by the evidence, and that the same is against law. The question involved in this assignment is whether or not Shannon, by reason of his employment, assumed the risk incident to missed holes. It is settled in this country, as a general rule, that the master is charged with the duty of furnishing his servant a reasonably safe place in which to work, and impliedly says to him that there is no other danger in the place than such as is obvious and necessary. *Baltimore & O. R. R. Co. v. Baugh,* 149 U. S. 368 (13 Sup. Ct. 914); *New England R. R. Co. v. Conroy,* 175 U. S. 323 (20 Sup. Ct. 85); *McDonough v. Great Northern Ry. Co.,* 15 Wash. 244 (46 Pac. 334); *Hammarberg v. St. Paul, etc., Lumber Co.,* 19 Wash. 537 (53 Pac. 727).

On the other hand, the servant, when he engages to the master to do a particular piece of work, assumes all the risks and hazards incident to or attendant upon the particular employment, including the risks and hazards resulting from the negligence of his fellow servants. *Hough v. Texas & Pacific R. R. Co.,* 100 U. S. 213; *Northern Pacific R. R. Co. v. Herbert,* 116 U. S. 642 (6 Sup. Ct. 59); *Baugh Case, supra.*

It is said in the *Baugh Case, supra*:

"But within such limits the master who provides the place, the tools, and the machinery owes a positive duty to his employee in respect thereto. That positive duty does not go to the extent of a guarantee of safety, but it does re-

quire that reasonable precautions be taken to secure .safety, and it matters not to the employee by whom that safety is secured, or the reasonable precautions therefor taken. He has a right to look to the master for the discharge of that duty, and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employee."

In the *Hammarberg Case, supra,* this court said:

"It is gratifying, however, to observe that recently judicial opinion seems to favor a restriction of the doctrine of non-liability for the actions of fellow servants, and the English rule, that a servant in command is a fellow servant, has been repudiated by a great majority of the American cases, and it seems now to be pretty well established that, in order to constitute one a fellow servant, he must be in the same common employment with the one who has suffered from his negligence.   Shearman & Redfield, Negligence (4th ed.), § 234.   And the question of whether particular employees are fellow servants is in some states submitted to the jury.   *Mullan v. Philadelphia & S. M. S. Co.,* 78 Pa. St. 25 (21 Am. Rep. 2). The rule was announced in that case that the risk which the laborer assumes from the neglect of his fellow is where they are co-operating in the same business, so that he knows that the employment is one of the incidents of their common service.   It has been held in Georgia that none are deemed to be in a common employment who have no opportunity to use precautions against each other's negligence.   *Cooper v. Mullins,* 30 Ga. 146 (76 Am. Dec. 638).   And this, we think, is in strict consonance with the just theory upon which the rule was first recognized."

And, at p. 452, quotes approvingly from *Sadowski v. Michigan Car Co.,* 84 Mich. 100 (47 N. W. 598) as follows:

"The rule adopted by the federal courts, and in most of the states, and which seems to us most in consonance

with reason and humanity, is that those employed by the master to provide or to keep in repair the place, or to supply the machinery and tools for labor, are engaged in a different employment from those who are to use the place or appliance when provided, and they are not therefore, as to each other, fellow servants. In such case, the one whose duty it is to provide and look after the safety of the place where the work is to be done represents the master in such a sense that the latter is liable for his negligence."

Applying these rules to the case before us, the question naturally arises, was the unexploded blast a danger necessarily incident to the employment? And, if not, was the pusher of another shift, having notice of the danger, a fellow servant with deceased in respect thereto? If the twelve men who were engaged in sinking the shaft had been working together, each doing his part, and each having notice of the work of the other and the existence of the unexploded blast and the danger thereof, and one of them carelessly discharged the same, clearly no liability therefrom could be imputed to the master. But where the men were divided into shifts working at different times, each shift taking its turn, then, under the rule above named, where there were hidden, unusual dangers arising from some cause unknown to an on-coming shift, it became the positive duty of the master to notify the servant in some way of the extra hazard which he was about to encounter. And this, it seems, the master had provided for, by delegating to the pusher of each outgoing shift the additional duty of notifying an on-coming shift of the missed holes. This being a positive duty of the master, the neglect of the pusher of the out-going shift to notify the on-coming shift was the negligence of the master and not of the fellow servant. Whether Shannon actually knew of the missed hole, whether the same

was obvious, and whether with reasonable diligence he could have ascertained that there was a missed hole, were questions which were submitted properly to the jury, and were by the general. verdict answered in the negative. There was evidence in the case which required the court to submit the questions to the jury and which supports the verdict.

No error appearing in the record, the case must be affirmed.

REAVIS, C. J., and FULLERTON and DUNBAR, JJ., concur.